**Elaine ALFORD, et al., Plaintiffs,**

v.

**KIMBERLY–CLARK TISSUE COMPANY,[1] Defendant.**

No. CIV. A. 95–0259–RV–M.

United States District Court,
S.D. Alabama,
Southern Division.

July 9, 1998.

---

1. Scott Paper Company ("Scott Paper") was the original defendant named in this lawsuit. On June 30, 1997, the court was informed that Scott Paper had "transferred all its property and assets to Kimberly–Clark Corporation." (Pls.' Mot. for Addition, Doc. 57 at ¶ 1). Accordingly, on July 16, 1997, the court ordered that Kimberly–Clark Tissue Company be substituted as the proper party defendant in this action. (Doc. 66).

Richard A. Meelheim, Christa Meelheim, Birmingham, AL, James P. Rea, Birmingham, AL, for Plaintiffs.

Kirk C. Shaw, Mobile, AL, Steven R. Wall, Erin F. Mulhollen, Philadelphia, PA, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

VOLLMER, District Judge.

This matter is before the court on defendant's "Motion for Partial Summary Judgment Regarding Plan Termination" (Doc. 71) which was filed after the close of limited discovery in accordance with Magistrate Judge Bert W. Milling's May 21, 1997 Order (Doc 53). Along with its motion, defendant filed a supporting brief (Doc. 72) and "Suggested Determinations of Undisputed Fact and Conclusions of Law" pursuant to Local Rule 7.2. Plaintiff has since filed a response in opposition to defendant's motion (Doc. 77), and defendant has filed a reply brief (Doc.

78). Both parties have supplemented their arguments with evidentiary submissions.

## I. OVERVIEW OF THIS LITIGATION

The Complaint in this action raises claims under the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. §§ 621–634 (1994). The issues in this case, however, have deviated far from those original age discrimination claims, into questions of meaningful waiver, and further into the issues of welfare benefit plan termination that are now presented before the court under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U .S.C. §§ 1001–1461. Because the ERISA issues now before the court are not typically implicated in an ADEA case, the court finds it necessary to provide some discussion of the history of this action.

### A. Procedural History

On March 29, 1995, plaintiffs filed their Complaint in this court, initiating this action and setting forth their claims of discrimination on the basis of age. Specifically, plaintiffs alleged that their jobs were selected for termination by the defendant, their former employer, based on the plaintiffs' respective ages at the time of termination.

Soon after this action was instituted, defendants filed their Answer and a Motion for Partial Summary Judgment, both of which alleged that the separation agreements signed by nearly all of the plaintiffs at the time of termination contained effective releases which preclude plaintiffs' ability to maintain this action. Plaintiffs responded to defendant's summary judgment motion by contesting the validity of the releases they signed upon termination. In opposing the effect of these releases, plaintiffs argued that the releases did not satisfy the statutory requirement that all waivers or releases of ADEA claims be "knowing and voluntary." 29 U.S.C. § 626(f)(1). Specifically, plaintiffs argued that the releases they signed were invalid because they were executed in exchange for severance benefits to which plaintiffs were already entitled under a long-standing employee welfare benefit plan, and that, therefore, the releases lacked adequate

consideration. *Cf.* 29 U.S.C. § 626(f)(1)(D) ("a waiver may not be considered knowing and voluntary unless at a minimum—... the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual is already entitled").

On July 6, 1995, this court issued an Order denying defendant's motion for partial summary judgment. In that Order, the court found that the releases signed by the plaintiffs' lacked consideration and, therefore, were ineffective waivers under the ADEA. On July 17, 1995, the defendant moved this court "to reconsider denial of the motion for partial summary judgment or, in the alternative, to certify the order denying partial summary judgment for interlocutory appeal." (Rec. on Appeal, Doc. 20 at 1). After affirming the July 6, 1995 Order on reconsideration, this court certified its decision in that Order for interlocutory appeal. Defendant's appeal to the United States Court of Appeals for the Eleventh Circuit was filed on September 1, 1995.

On February 12, 1997, the Eleventh Circuit issued an opinion reversing this court's Order and remanding for further findings. Specifically, the Eleventh Circuit remanded for the consideration of two issues: (1) whether, prior to plaintiffs signing the release forms, the defendant had terminated the severance benefit plan which provided the basis for this court's conclusion that the waivers lacked consideration; and (2) whether, despite a termination of the plan, the plaintiffs actually and reasonably relied on certain provisions of a 1986 Summary Plan Description when they signed the waiver forms.

On remand, this court entered an Order directing the parties to complete discovery on the sole issue of whether the waivers signed by the plaintiffs were supported by consideration—or, alternatively stated, whether, prior to plaintiffs signing the release forms, the defendant had effectively terminated the long-standing severance benefit and instituted a plan that required signed releases in exchange for severance benefits. The court further ordered the defendant to file a motion for summary judgment on the plan termination issue once this limited discovery was completed.

## B. Issues Now Before the Court

To permit a proper ruling on the question of whether the signed releases were supported by consideration, this court must determine whether the plaintiffs were already entitled to severance pay at the time the releases were executed. In deciding this question, the court must review certain issues relating to ERISA's requirements for employee welfare benefit plan terminations. Specifically, the court must determine whether, under ERISA, the defendant's actions in changing the requirements for severance pay constituted a valid and effective termination, modification, or an amendment of the employee welfare benefit plan that was previously in place.

## II. PROCEDURAL BACKGROUND

### A. *Jurisdiction*

Plaintiffs brought this suit alleging claims under the federal Age Discrimination in Employment Act. Accordingly, this court has original jurisdiction over the federal questions presented in this lawsuit pursuant to 28 U.S.C. §§ 1331 & 1343(4).

### B. *Venue*

Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b).

### C. *Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence must be viewed in the light most favorable to the nonmoving party, "and all justifiable inferences are to be drawn in the nonmoving party's favor." *Hoffman v. Allied Corp.,* 912 F.2d 1379, 1383 (11th Cir. 1990); *see also Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1500 (11th Cir.1991); *Langston v. ACT,* 890 F.2d 380, 383 (11th Cir.1989). In ruling on a motion for summary judgment, the function of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether

there is an issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 242–43, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The standard for awarding summary judgment is the same as that for a directed verdict: "the trial judge must grant [the motion] if, under governing law, there can be but one reasonable conclusion as to the verdict." *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996); *see also Hoffman,* 912 F.2d at 1383 ("The standard for summary judgment mirrors the standard for a directed verdict."). The moving party satisfies its burden on summary judgment by demonstrating a lack of evidence in the record to support an element .of the of the nonmovant's case. *See Weiss v. School Bd.,* 141 F.3d 990, 994 (11th Cir.1998). "Once the moving party demonstrates the absence of a genuine material fact, whether or not accompanied by affidavits or other proof, the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). To avoid an adverse ruling on a motion for summary judgment, the nonmoving party must provide more than a mere scintilla of evidence. *See Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). Additionally, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv., Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

2. For ease of reference, this Order shall primarily refer to Scott Paper, rather than Kimberly–Clark Tissue Company, because all events in this action occurred prior to Scott Paper's transfer of assets to Kimberly–Clark.

3. The plaintiffs who were involuntarily terminated in August, 1994 include: Deloris T. Bagsby, Peggy Brockett Bailey, Arzie Berry, Jr., David Bishop, Blanche Y. Cannon, Patricia Carlson, Jerry Michael Chambliss, Mary C. Chestang, E.M. Cole, Claude Collins, William E. Davison, James G. Dykes, Carl G. Dyson, Jr., Martha Evans, Hatie Harper, Eugene L. Harris, Thom C. Hill, Winona B. Jefferson, Jerry Johnson, Annie

## III.  FINDINGS OF FACT

The facts pertinent to the defendants' motion for summary judgment are mostly undisputed.  Where there is any discrepancy in the record, the court views the evidence in the light most favorable to the plaintiff.

### A.  The Events Which Gave Rise to This Lawsuit

The present dispute stems from the 1994 downsizing efforts of Scott Paper[2] at its facilities in Mobile, Alabama.  During the month of August, 1994, Scott Paper reduced its work force at the Mobile facility from two thousand and ninety (2,090) employees to one thousand six hundred (1,600) employees. Further reductions apparently occurred over the next two months.  During August, 1994, forty-two (42) of the forty-nine (49) plaintiffs in this action had their jobs involuntarily terminated.[3]  In September, 1994, plaintiff, Dian G. Washington, had her employment involuntarily terminated.  In October of the same year, the six remaining plaintiffs were involuntarily terminated from their employment with the defendant.[4]  At the time of these terminations, nearly all of the plaintiffs received a severance payment from Scott Paper.  Prior to receiving this severance pay, the recipient plaintiffs executed a waiver form labeled "Employee Separation Agreement and General Release." (*See* Rec. on Appeal, Doc. 8, Attach. 1).

### B.  Background Information on Defendant's Termination Pay Benefit Plan

Scott Paper first adopted a company policy of providing severance benefits to discharged employees on October 26, 1931.  On January

H. King, A. Dennis Ledbetter, Donna Lewis, Thomas R. Maddox, Rhoda Pam McCarty, Sharon P. McLain, Jessie G. Osborn, Leon Overstreet, James W. Parker, Glenn W. Pugh, Kenneth R. Richardson, Dorothy C. Sanders, Lillie Kent Savage, Donna W. Shamp, Jannice Sims, Judith St. Clair, Richard J. Stone, Billy G. Swopes, Robert Earl Tyer, Thomas S. Vereen, Jr., John R. Watson, Jimmy Wright, and Joseph Zemenaustas.

4. The six plaintiffs who were involuntarily terminated in October, 1994 include: Elaine Alford, LaJuanna H. Kotis, Sheila Nettles, Jacqueline Rice, Nancy Wasdin, and Joan D. Weldy.

1, 1985, an amended and formalized version of the original severance policy was put into effect in the form of the "Scott Paper Company Termination Pay Plan for Salaried Employees" ("1985 Plan"). (Doc. 77, Ex. 3). The 1985 Plan provided that if it were to be modified or amended, the modification or amendment had to be accomplished by the Executive Committee of the company. The plan also provided that:

> 6.1 Notwithstanding any such modification or amendment, any Employee whose Employment is terminated involuntarily on or after the effective date of such modification or amendment shall receive no fewer weeks of Termination Pay than he or she would have received if his or her employment had terminated involuntarily on the day before the effective date of such modification or amendment.

(1985 Plan, Doc. 77, Ex. 3 at 5).

In April, 1986, Scott Paper distributed to its employees a Summary Plan Description ("SPD") of the 1985 Plan. (Doc. 77, Ex. 4). Similar to the plan itself, yet in a somewhat different form, the SPD contained the following assurance regarding plan modification or termination:

> [I]f your employment is terminated involuntarily subsequent to the time that the Plan is terminated, modified or amended, you will receive no fewer weeks of termination pay than you would have received if your employment had been terminated involuntarily on the day before the Plan was terminated, modified or amended.

(SPD, Doc. 77, Ex. 4 at 3–4).

The latest amendment to the 1985 Plan, which took effect on January 1, 1991, transferred the Executive Committee's amendment, modification and termination authority to the Executive Compensation Committee. (*See* Am. 1985 Plan, Doc. 77, Ex. 10 at 10–11). Like the earlier versions of the plan, the Amended 1985 Plan contained a provision setting forth procedures for plan termination:

> 6.2 It is the intention of the Company to continue the Plan and to make Termi-

nation Payments to all eligible Employees, but the Company, by action of its *Executive Compensation Committee* and subject to Section 7.1, may for any reason terminate the Plan or withhold its application as to all Employees in one or more subsidiaries or operating divisions of the Company... [A]ny such action shall be effective at such date as the *Executive Compensation Committee* may determine[.]

(Am. 1985 Plan, Doc. 77, Ex. 10 at 10–11).

Despite the Executive Compensation Committee's addition to the plan's amendment, modification and termination procedures in 1991, the committee's existence as a functioning corporate entity was short-lived. On July 19, 1994, Scott Paper's Board of Directors passed a resolution which dissolved the Executive Compensation Committee and transferred that committee's functions to the Board's Operating Committee. This transfer of authority was not noted in the plan's documents prior to the plaintiffs' discharge from the company.

## C. The "Termination" of the Amended 1985 Plan

In February, 1994, prior to the plaintiffs' termination, William Bubb, Scott Paper's senior in-house employment counsel, was asked to review the Amended 1985 Plan to determine whether it allowed Scott Paper the discretion to deny severance benefits to terminated employees whose positions had been out-sourced. After review, Mr. Bubb concluded that the plan, as it existed, did not allow such action. To remedy this limitation in the plan, Mr. Bubb recommended that the Amended 1985 Plan be terminated to allow the company discretion to deny severance benefits to certain employees whose positions were scheduled to be out-sourced. Bubb recommended termination of the plan rather than amendment because he felt that section 6.1 of that plan limited the company's ability to accomplish its goals through amendment.[5]

---

**5.** In his deposition, Mr. Bubb stated:
   [W]e concluded that the first section—I think it was 6.1—created some question about whether if we just amended the Plan we would be able to make the change that I described the desire to make.

So we decided that the better course would be to terminate the Plan relying on the second part of Section 6, which I believe, was numbered 6.2, which did not contain any language limiting a diminution in the benefit.
(Bubb Dep., Doc. 72, Ex. A at 31).

At a later date, Mr. Bubb recommended that any changes in the plan instituted after the proposed termination should also include a revised termination pay provision which would require terminated employees to execute a release form in exchange for severance benefits.

On August 1, 1994, the Operating Committee acted on Bubb's recommendations and passed the following resolution regarding the Amended 1985 Plan:

> RESOLVED, that the Current Plan is terminated effective August 2, 1994, that a new Termination Pay Plan for Salaried Employees in the form attached hereto as Exhibit "B" ("the New Plan") is adopted by the Company effective August 3, 1994, ... and that the Company take whatever additional action is necessary to effectively terminate the Current Plan and institute the New Plan.

(Mins. of 8/1/94 Operating Comm. Meeting, Doc 72, Ex. E at 2). The new Termination Pay Plan for Salaried Employees ("1994 Plan") differed from the Amended 1985 Plan in that a provision was added to accommodate Scott Paper's severance pay concerns regarding out-sourced workers, and another provision was added to require the execution of a release form in exchange for any entitlement to severance benefits. The release requirement provision can be found in the 1994 Plan's section governing eligibility:

> 2.6 Eligibility for Termination Pay under the Plan is conditioned on the execution by the Employee of a release of claims in a form acceptable to the Company.

(1994 Plan, Doc. 72, Ex. F at 6).

## IV. DISCUSSION

In its motion for partial summary judgment, defendant asserts that the "Scott Paper Company Termination Pay Plan for Salaried Employees" ("1985 Plan") was effectively terminated on August 2, 1994. Plaintiffs have opposed this assertion arguing that "Scott Paper's attempt to terminate the plan was invalid because it (a) was attempted by an unauthorized/invalid procedure and (b) was in actuality nothing more than an amendment." (Pls.' Br. Opp'g Summ. J., Doc. 77 at 7). This argument not only states plaintiffs' grounds for opposing entry of partial summary judgment, but

also is a fair recitation of the two sub-issues that are presented in this case.

**A.** *Was the defendant's attempt at terminating the benefit plan rendered invalid by a failure to follow required procedures?*

Defendant asserts that its actions on August 1, 1994 effectively terminated the Amended 1985 Plan under which plaintiffs claim they received their severance benefits. The specific action taken on that date was a resolution to terminate the Amended 1985 Plan passed by the Operating Committee of defendant's Board of Directors.

Plaintiffs contend that this "termination" by the Operating Committee was invalid because that committee lacked the authority to terminate, amend, or modify the plan. Specifically, plaintiffs point to the terms of the plan itself which reserved termination authority to the Executive Compensation Committee:

> 6.2 It is the intention of the Company to continue the Plan and to make Termination Payments to all eligible Employees, but the Company, by action of its *Executive Compensation Committee* and subject to Section 7.1, may for any reason terminate the Plan or withhold its application as to all Employees in one or more subsidiaries or operating divisions of the Company... [A]ny such action shall be effective at such date as the *Executive Compensation Committee* may determine[.]

(Am. 1985 Plan, Doc. 72, Ex. B at 10–11 (emphasis added)). Essentially, plaintiffs argue that the defendant's failure to follow plan termination procedures constitutes a procedural violation of ERISA, which can only properly be remedied by declaring the defendant's termination decision invalid.

■ The parties' dispute on this issue presents an unusual factual background for an alleged ERISA procedural violation. While there are numerous cases addressing ERISA procedural violations where an employer failed to specify its amendment or termination procedures in a welfare benefit

plan, there is a relative dearth of cases where the alleged procedural violation originated with an employer's failure to follow the procedures set forth in a plan. This distinction, however, simplifies rather than complicates the legal issues presented. Although it is unclear whether, under ERISA, an employer must specify a termination procedure in its welfare benefit plans,[6] the law is clear that once such procedures are set forth in a plan, those procedures must be followed. *See Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 85, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("ERISA, rather, follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure *or elsewhere,* it is bound to that level." (emphasis added)); *see also Deibler v. United Food and Commercial Workers' Local Union 23,* 973 F.2d 206, 210 (3d Cir.1992) ("ERISA generally allows employers to amend or terminate welfare benefit plans at will so long as the procedure followed is consistent with the plan and the Act."). Accordingly, this issue reduces itself to two fairly discrete questions: (1) did the defendant follow the termination procedures specified in the Amended 1985 Plan, and (2) if the procedures were not followed, whether the "termination" by the Operating Committee was valid.

In arguing for summary judgment on these questions, defendant has stated three bases for the validity of the contested plan termination: (1) the procedures for termination under the Amended 1985 Plan were not violated insofar as the plan specified that "the Company" had the power to terminate and the company did so by action of its Operating Committee; (2) although the Executive Compensation Committee had been dissolved, its authority had been validly real-

located to the Operating Committee and, therefore, termination was valid; and (3) despite any procedural irregularity, the termination cannot be rendered invalid in this case because the plaintiffs have not shown bad faith, active concealment, or detrimental reliance. The court addresses each of the defendants arguments separately in the following discussion.

1. *Defendant's assertion that the procedures for termination under the Amended 1985 Plan were not violated insofar as the plan specified that "the Company" had the power to terminate and the company did so by action of its Operating Committee.*

After review, the court finds no merit in the defendant's claim that the Amended 1985 Plan "committed the decision to terminate the Plan to the discretion of the Company." (Def.'s Br. Supp. Summ. J., Doc. 72 at 18). Although the plan does provide that it can be terminated by "the Company," it specifically limits the company's termination power to the "action of its Executive Compensation Committee." (Am. 1985 Plan, Doc. 72, Ex. B at 10). This designation of the Executive Compensation Committee states a valid termination procedure under ERISA. *See Curtiss–Wright,* 514 U.S. at 79, 115 S.Ct. 1223 (stating that "to identify [an entity] as the person with amendment authority is to say, in effect, that the procedure for identifying the person with amendment authority is to look always to [that entity]"). The defendant appears to have missed this point somewhat in its assertion that this reference to the " 'Executive Compensation Committee' merely provide[s] the vehicle by which the Company could take its action." (Def.'s Br. Supp. Summ. J., Doc. 72

---

6. In *Aldridge v. Lily–Tulip, Inc.,* the Eleventh Circuit found, with respect to a pension benefit plan, that the procedural requirements of section 402 of ERISA, "although applicable to plan amendments, are not applicable to plan terminations." 40 F.3d 1202, 1210 (11th Cir.1994). Although the *Aldridge* court's language was broad enough to encompass both welfare and pension benefit plans, this court notes that *Aldridge* opinion rejected the application of section 402 due to the presence of the notice and reporting requirements set forth at 29 U.S.C. § 1341. *Id.* 40 F.3d at 1210 ("The notice and procedural

requirements specifically tailored for terminations under § 1341 are sufficient to keep employees apprised of their benefits under the plan and to promote certainty with regard to terminations."). Section 1341, however, applies only to pension benefit plans. *See Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 839, 861 n. 15 (S.D.N.Y.1994). Accordingly, the *Aldridge* court's statement regarding the applicability of section 402 to plan terminations arguably has no import when considering a welfare benefit plan termination, as is present in this case.

at 18). By providing this specific "vehicle" for termination under the plan, the defendant established a termination procedure that functioned "by action of [the] Executive Compensation Committee." (Am. 1985 Plan, Doc. 72, Ex. B at 10). As the Supreme Court has made clear: "An employer may, of course, retain the unfettered right to alter its promises, *but to do so it must follow the formal procedures set forth in the plan.*" *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997) (emphasis added); *see also Curtiss–Wright,* 514 U.S. at 85, 115 S.Ct. 1223 ("whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level"). The plan at issue clearly provided for action by the Executive Compensation Committee, yet it was the company's Operating Committee that passed the 1994 termination resolution. Accordingly, the court rejects the defendant's contention that the plan's termination procedure was not violated insofar as "[t]he 1985 Plan committed the decision to terminate the Plan to the discretion of 'the Company.'" (Def.'s Summ. J. Br., Doc. 72 at 18). Such contention is clearly incorrect.

2. *Defendant's argument that, although the Executive Compensation Committee had been dissolved, its authority had been validly reallocated to the Operating Committee prior to the August 1, 1994 resolution, and, therefore, termination was valid.*

■ Defendant correctly asserts that Scott Paper's Board of Directors had validly transferred authority from the Executive Compensation Committee to the Operating Committee prior to the termination of the plan. Accordingly, Scott Paper can be bound under principles of corporate law by the Operating Committee's decision to terminate the Amended 1985 Plan. *Cf.* Fletcher, *supra* § 448, at 413 ("When authority to do a particular act is conferred upon an officer, and before the time for exercise of the authority the office is abolished and the duties of the officer assigned generally to another officer, the latter has authority to do the act."). Defendant, however, neglects to consider

that, while it had transferred the functions of the Executive Compensation Committee to the Operating Committee for corporate governance purposes, no such transfer of authority had been made in the plan procedures. Accordingly, the defendant's decision to terminate the Amended 1985 Plan through its Operating Committee, while valid as a corporate action, was not in accordance with the termination procedures set forth in the plan. The court, therefore, rejects the defendant's argument regarding the claimed reallocation of authority to the Operating Committee. Regardless of such reallocation, the Operating Committee's action in terminating the Amended 1985 Plan did not comply with the governing plan procedures. The effect of the defendant's failure to comply with plan procedures is discussed below.

3. *Defendant's assertions that, despite any procedural irregularity, the termination cannot be rendered invalid in this case because the plaintiffs have not shown bad faith, active concealment, or detrimental reliance.*

■ Although the defendant asserts that there has been no showing of bad faith, active concealment, or detrimental reliance in this case, there is still some question as to whether a lack of evidence on those issues has any import on the validity of the August, 1994 plan termination. Defendant contends that, under governing case law, procedural violations of ERISA, such as the termination in this case, cannot be rendered invalid absent a showing of bad faith, active concealment, or detrimental reliance. Not surprisingly, plaintiffs oppose defendant's contention and assert that the attempted termination was procedurally defective, and, therefore, must be declared invalid per se. After reviewing both parties' arguments, the court concludes that the defendant has provided a more accurate statement of the law.

The disagreement between the parties on this issue is not novel. The federal judiciary is also divided on the question of the proper remedy for an ERISA procedural violation. Although the plaintiffs appear to argue that the Supreme Court ruled on the issue of remedy in *Curtiss–Wright v. Schoonejongen,*

514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), the court disagrees.

In *Curtiss–Wright,* the Supreme Court faced a procedural violation claim under ERISA section 402(b)(3). *Id.* 415 U.S. at 75, 94 S.Ct. 937. *See* 29 U.S.C. § 1102(b)(3) (codifying ERISA section 402(b)(3)). After ruling that there was no such violation, the court stated "we do not reach the question of the proper remedy for a § 402(b)(3) violation." *Curtiss–Wright,* 514 U.S. at 85, 115 S.Ct. 1223. Although the Supreme Court remanded for a determination of whether the plan's procedure was complied with in that case, there was no guidance provided as to the specific remedy that should result if procedures had not been followed. *Id.; see also Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 568 (7th Cir.1995) (noting that the effect of a violation of 29 U.S.C. § 1102(b)(3) was "a question left open by the Supreme Court"). Indeed, even if the *Curtiss–Wright* opinion could be construed as requiring invalidation of the amendment in that case where the plan procedures had not been followed, the facts in the instant litigation present a major distinction that requires a different result.

In the plan at issue in *Curtiss–Wright,* the amendment procedure was inextricably tied to issues of corporate authority and governance. Such was the case because the plan required action by "the Company." *Curtiss–Wright,* 514 U.S. at 79, 115 S.Ct. 1223. If the plan procedure in that case was not followed, then the company could not be deemed to have acted. It was for this reason that the Supreme Court remanded the case for a determination of whether the procedure listed in the plan had been followed. *Id.* 514 U.S. at 85, 115 S.Ct. 1223. Because the core question was whether the company itself had acted, the issue presented on remand was more a question of corporate law than of ERISA law. *See generally Schoonejongen v. Curtiss–Wright Corp.,* 143 F.3d 120, (3rd Cir. 1998) (discussing, on remand, the question of whether the defendant's amendment which terminated post-retirement health benefits complied with Delaware corporate law). A consideration of corporate law on remand was necessary to ascertain whether the actor who amended the Curtiss–Wright plan had authority to do so on behalf of "the Compa-

ny." If the actor who "amended" the plan lacked such authority, and the company did not ratify the unauthorized action, the attempted amendment would have to be declared invalid. To assist the appeals court's determination on this issue on remand, the Supreme Court referenced a section of a legal treatise dealing with the authority of agents, officers and committees to act on behalf of a corporation. *Id. See* 2 W. Fletcher, Cyclopedia of the Law of Private Corporations § 444, at 397–98 (1990) (noting various means by which a corporation can confer authority).

In the present case, the same issues of corporate law are not present. As previously discussed, Scott Paper had transferred authority from its Executive Compensation Committee to its Operating Committee prior to the termination of the plan. Accordingly, Scott Paper could be bound under principles of corporate law by the Operating Committee's decision to terminate the Amended 1985 Plan. *Cf.* Fletcher, *supra* § 448, at 413 ("When authority to do a particular act is conferred upon an officer, and before the time for exercise of the authority the office is abolished and the duties of the officer assigned generally to another officer, the latter has authority to do the act."). The only issues that remain are: (1) whether the Scott Paper's failure to follow the procedures set forth in the plan constitutes a violation of ERISA; and (2) if there was a violation, what remedy is appropriate.

The court has no trouble finding that Scott Paper violated ERISA by failing to follow the termination procedure set forth in the plan. The nature of the ERISA violation in this case was made clear by the Supreme Court in *Curtiss–Wright:*

> ERISA, rather, follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure *or elsewhere,* it is bound to that level.

*Id.* 514 U.S. at 85, 115 S.Ct. 1223. *See Inter–Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997) ("An employer may, of course, retain the unfettered right to alter its promises, but to

do so it must follow the formal procedures set forth in the plan."). In the plan at issue, the defendant set forth a procedure under which plan termination decisions were to be made by the Executive Compensation Committee. The decision to terminate the Amended 1985 Plan was made, however, by the defendant's Operating Committee. Although the defendant had transferred the functions of the Executive Compensation Committee to the Operating Committee for corporate governance purposes, no such transfer of authority had been made in the plan procedures. Therefore, the defendant violated ERISA by failing to "follow the formal procedures set forth in the plan." *Id.*

The remaining question, therefore, is, what effect, if any, does Scott Paper's failure to follow its plan procedures have on the validity and effect of its termination decision? Although one court has found that failure to comply with ERISA's procedural requirements in amending a plan renders that amendment ineffective, a larger number of courts, including the Eleventh Circuit, have rejected the application of an all-or-nothing remedy in favor of an approach that "serves the dual purpose of protecting the rights of beneficiaries in the plan while allowing flexibility to the plans to grow or diminish at any time, as allowed by law." *Whitfield v. Torch Operating Co.,* 935 F.Supp. 822, 831 (E.D.La. 1996); *compare Schoonejongen v. Curtiss–Wright Corp.,* 18 F.3d 1034, 1040 (3d Cir. 1994) (finding that failure to follow ERISA procedure rendered an employer's amendment to a plan invalid), *rev'd,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), *with Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 568 (7th Cir.1995) (finding that invalidation of plan amendments was not required absent a showing of bad faith, active concealment, or detrimental reliance); *and Aldridge v. Lily–Tulip, Inc.,* 40 F.3d 1202, 1211–12 (11th Cir.1994) (finding no per se

invalidation rule for procedural violation; rather, amendment would only be found to be void on a showing of detrimental reliance). Accordingly, the court rejects the application of a per se invalidation rule in this case. Instead, the court finds under the more balanced approach that, regardless of Scott Paper's failure to follow plan procedures in this case, the plan termination at issue must be considered valid absent a showing of active concealment, detrimental reliance, or bad faith. *See Murphy,* 61 F.3d at 569.

After reviewing the parties' submissions on summary judgment, the court notes that the plaintiffs have produced neither argument nor evidence which would demonstrate active concealment or bad faith on the part of Scott Paper. Accordingly, the plaintiffs have failed to demonstrate a triable issue of fact regarding active concealment or bad faith. Additionally, while the plaintiffs have advanced a detrimental reliance argument in this case, that argument pertains only to plaintiffs' purported reliance on certain language in the 1986 Summary Plan Description.[7] The referenced Summary Plan Description language does not concern the procedural violation at issue here, but instead deals with the plaintiffs' entitlement to termination pay benefits irrespective of plan termination, amendment, or modification.[8] Thus, the plaintiffs have failed to create a genuine issue of fact regarding their detrimental reliance on the plan termination procedures.

Insofar as the evidence in this case fails to demonstrate active concealment, bad faith, or detrimental reliance, the court finds that the Operating Committee's termination of the Amended 1985 Plan must be held to be valid. Consequently, the defendant's motion for partial summary judgment is due to be granted, unless the plaintiffs have generated sufficient evidence to demonstrate that the

7. "However, if this Court finds that the plan was terminated, Plaintiffs may still prevail on the release issue by proving individually that each of them relied on the faulty summary plan descriptions during the period of time in which the which the summaries were distributed." (Pls.' Resp. Br., Doc. 77 at 3).

8. As previously mentioned, the Eleventh Circuit remanded this case for the consideration of two issues. The first issue involves the matter now

before the court on defendant's summary judgment motion. The second issue concerns whether, regardless of the validity of defendant's plan termination, the plaintiffs actually and reasonably relied on certain portions of the 1986 Summary Plan Description when they signed release forms in exchange for severance benefits. The plaintiffs' detrimental reliance argument goes to this second issue, which has yet to be briefed by the parties.

"termination" at issue in this case was nothing more than an amendment or modification of the Amended 1985 Plan.

### B. Was the claimed termination of the benefit plan nothing more than an amendment or modification of that plan?

■ In addition to asserting their general challenge to the validity of the Operating Committee's August 1, 1994 resolution, plaintiffs contend that the Committee's action did not constitute a termination of the Amended 1985 Plan, but rather an amendment or modification subject to the protections afforded under the plan. Under section 6.1 of the Amended 1985 Plan, employees were assured that "notwithstanding any ... modification or amendment, any Employee whose Employment is terminated involuntarily on or after the effective date of such modification or amendment shall receive no fewer weeks of Termination Pay than he or she would have received if his or her employment had terminated involuntarily on the day before the effective date of such modification or amendment." (Am. 1985 Plan, Doc. 77, Ex. 10 at 10). Plaintiffs assert that Scott Paper's actions in the present case constituted nothing more than an amendment or modification of the Amended 1985 Plan. Accordingly, plaintiffs contend that they were entitled to termination pay under the plan as it existed prior to the Operating Committee's August 1, 1994 resolution—i.e. before the requirement of a signed release was added as a precondition to receiving benefits.

Plaintiffs' argument in favor of finding an amendment or modification in this case is based in the plain meaning of the word "termination." Plaintiffs assert that, despite the defendant's argument to the contrary, nothing ended when the Amended 1985 Plan was purportedly terminated on August 2, 1994. Instead, the termination pay plan continued to exist, albeit in a somewhat different form, and with different requirements.

Although the plaintiffs' argument is not wholly without appeal, the court finds that the better approach to this dilemma is to look: (1) to the intent of the Operating Committee at the time of its resolution, and (2) to determine whether the Committee acted on its intent. Cf. Biggers v. Wittek Indus., Inc., 4 F.3d 291, 295–96 (4th Cir.1993) (resolving a question regarding whether a plan had been amended by looking for "a clear manifestation of an intent to alter the policy or plan").

After reviewing the evidence relating to the Committee's intent at the time of the August 1, 1994 resolution, the court finds that there is no triable issue regarding the defendant's intent to terminate the Amended 1985 Plan. The undisputed evidence on this issue clearly demonstrates that the Committee elected to terminate the plan to avoid the reach of the protections afforded by section 6 .1. Indeed, Scott Paper's senior in-house employment counsel testified that he specifically recommended such action to the Committee:

> [W]e concluded that the first section—I think it was 6.1—created some question about whether if we just amended the Plan we would be able to make the change that I described the desire to make.

> So we decided that the better course would be to terminate the Plan relying on the second part of Section 6, which I believe, was numbered 6.2, which did not contain any language limiting a diminution in the benefit.

(Bubb Dep., Doc. 72, Ex. A at 31).

Similarly, the uncontested evidence in the record demonstrates that the Committee acted on its intent to terminate the plan in choosing the language used in the August 1, 1994 resolution:

> RESOLVED, that the Current Plan is terminated effective August 2, 1994, that a new Termination Pay Plan for Salaried Employees in the form attached hereto as Exhibit "B" ("the New Plan") is adopted by the Company effective August 3, 1994, ... and that the Company take whatever additional action is necessary to effectively terminate the Current Plan and institute the New Plan.

(Mins. of 8/1/94 Operating Comm. Meeting, Doc 72, Ex. E at 2 (emphasis added)). Although the plaintiffs have cited to dictionary definitions to call the issue of termination into question, they have failed to cite to any meaningful evidence in the record which would indicate that the Committee intended to do anything other than terminate the Amended 1985 Plan. Accordingly, the court

finds that the plaintiffs have failed to generate a genuine factual issue to show that Scott Paper acted to amend or modify, rather than terminate, the Amended 1985 Plan.

## V. CONCLUSION

Based on the foregoing, the court concludes that defendant's "Motion for Partial Summary Judgment Regarding Plan Termination" is due to be, and hereby is **GRANTED**. To facilitate the resolution of the remaining issues in this case, this matter is hereby **REFERRED** to United States Magistrate Judge Bert W. Milling, Jr. for the entry of a scheduling order.